# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner, on behalf of himself and his minor child J.W.

v.

The School Board of Hillsborough County, Florida

Case Number 8:23-CV-1029

# Motion for Preliminary Injunction and Incorporated Memorandum of Law

## I  Introduction

*Plaintiff*, pursuant to Fed. R. Civ. P. 65, moves the Court for a narrowly tailored mandatory preliminary injunction to force *Defendant* to place a single student (J.W.) at Carrollwood K-8 for the 2023-2024 sixth grade school year, or in the alternative enjoin *Defendant* for implementing the Carrollwood K-8 format change–outlined in Exhibit E–to maintain the status quo[1].

*Plaintiff* re-alleges and incorporates by reference the entire Verified Complaint (Doc. 1).

---

[1] J.W. cannot be denied an equal educational opportunity if that school does not exist and no child has that opportunity.

1

# Memorandum of Law

## II  Legal Standards

Injunctive relief is appropriate where, as here, Plaintiffs can establish that:

1. they have a substantial likelihood of success on the merits; and
2. irreparable injury will result absent injunctive relief; and
3. the balance of the equities tips in their favor; and
4. the injunction would serve the public interest;[2]

### 1.  Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. Id.

At the preliminary-injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" 828 Mgmt., LLC v. Broward Cnty., 508 F. Supp. 3d 1188, 1193 (S.D. Fla. 2020) (quoting Levi Strauss & Co. v. Sunrise Int'l Trading, 51 F.3d 982, 985 (11th Cir. 1995)).

---

[2] see e.g., Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## 2. Liberally Construed

Both Fla. Stat. § 1002.31 and 20 U.S. Code § 1703(c) are remedial statutes and should be liberally construed to effect the legislature's remedial purpose.

# III Argument

## 1. Standing

*Plaintiff* has standing because he suffers a concrete injury in the form of increased transportation costs to more distant schools, being denied an equal educational opportunity, and a decrease in the property value of their home.

The Superintendent freely admits to manipulating property values through assigned schools in a news interview[3]:

> "We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values. The more we continue to address our high quality education within within everyone of our schools." -Addison Davis

If better school ratings increase the property values of homes that are assigned to them, then the inverse must also be true: assigning low performing schools to a home decreases that homes property value.

---

[3] *see* Exhibit M, https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

## 2. Plaintiffs Are Substantially Likely to Prevail on the Merits

### A.  Fla. Stat. § 1002.31: Controlled Open Enrollment

*Plaintiff* applied for J.W. to be admitted in Carrollwood K-8 during the school choice application window [4] on April 18, 2023[5] for the sixth grade 2023-2024 school year, after the first successful school board vote to expand Carrollwood Elementary from a K-5 format to K-8. While the final school board vote to officially create Carrollwood K-8 did not occur until May 9, 2023[6], the school board makes the school choice decisions later in mid-may 2023[7] which makes *Plaintiff*'s application timely. This odd timing situation was a direct result of *Defendant*'s incompetence during the boundary process: They violated their own administrative rule that required at least one year's notice of boundary changes, then repealed that rule after constituents complained about it, then prpessed forward with rushed boundary changes, then abandoned those boundary changed, delayed, flip-flopped on the issue, then managed to pass this boundary change *after* the school choice window had closed. If we accept *Defendant*'s argument that the school choice application was untimely because it was made one month before the school officially existed (but after the school choice window had closed), then school districts would be free to careful time their boundary changes to exclude school students, who a re often minority and under-served children, from schools. It would eviscerate the legislative intent of Fla. Stat. § 1002.31. *Plaintiff*'s school choice application can relate back from the time the school was created.

---

[4] *see* Exhibit H
[5] *see* Exhibit D
[6] "»Nadia Combs: THANK YOU, MEMBER VAUGHN. PLEASE VOTE WHEN YOUR LIGHTS APPEAR. AND IT PASSES UNANIMOUSLY. 7.10. CARROLLWOOD SCHOOL PRE-K THROUGH 8th GRADE BOUNDARY CHANGE PROPOSAL.". *see* https://schoolboard.hcpswebcasts.com/text/hcsb2023-05-09.html
[7] *see* Exhibit H

This appears to be a case of first impression, therefore we fallback to the basic tenants of statutory interpretation.

Legislative intent controls construction of statutes in Florida, and that intent is primarily determined from language of the statute[8].

Where a statute can be construed according to the plain meaning of it's terms, it will be. The plain meaning rule applies where the terms are "clear and unambiguous" and the statute "conveys a clear and definite meaning"[9].

Here, the law is "clear and unambiguous", with an exact set of rules explicitly outlined in the statute itself. There is no ambiguity to resolve, and the statute should be given it's plain meaning as the legislature intended: that in Florida, it is not only public policy, but the law that all public schools are open to all students[10] as long as there is capacity to accept them. "The school district or charter school *shall* accept the student, pursuant to that school district's or charter school's controlled open enrollment process".

### B.  20 U.S. Code § 1703(c): EEOA Closest School

### C.  Elements

This appears to be a matter of first impression, so the case citations will be light. A plain reading of the statute would reveal the elements of this cause of action to be:

1. the assignment by an educational agency of a student to a school; and

2. other than the one closest to his or her place of residence within the school district in which he or she resides; and

---

[8] *see* Schoeff v. R.J. Reynolds Tobacco Co., 232 So. 3d 294, 312 (Fla. 2017)(Pariente, J., concurring).
[9] *see* Terranova Corp. v. 1550 Biscayne Assocs., 847 So. 2d 529, 532 (Fla. 3d DCA 2003)
[10] Even students that frequently sue the School Board.

3. the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

1. *Defendant* assigned J.W. to Adams Middle School using his home address. *see* Exhibit K.

2. J.W.'s home is 1.6 miles from Carrollwood K-8. *see* Exhibit A.

3. J.W.'s home is 2.3 miles from Adams Middle School. *see* Exhibit B.

4. Adams Middle School is a failing school with a D-rating from the Florida Department of Education. *see* Exhibit G.

5. Adams Middle School's student demographics are 29.65% black, 55.13% Hispanic, and 7.05% white. *see* Exhibit F pp. 1.

6. Carrollwood K-8 is a good school with an A-rating from the Florida Department of Education. *see* Exhibit G.

7. Carrollwood K-8's student demographics are 7.56% black, 39.56% Hispanic, and 41.78% white. *see* Exhibit F pp. 4.

8. *Defendant* created a greater degree of segregation when they assigned the African-American *Plaintiffs* to further away minority school (Adams) despite there being a closer white school (Carrollwood K-8).

    While the EEOA is ambiguous on how the distance between the schools and the residence is measured, *Defendant* cannot show any reasonable measure of distance where Adams Middle School is closer to the *Plaintiff*'s home than Carrollwood K-8:

1. Driving distance is 1.6 miles vs 2.4 miles (Adams is 50% further);
2. Drive time is 6 minutes vs 6-9 minutes (Adams takes 25% more drive time on average);
3. 1.24 miles v 1.68 miles as the crow flies (Adams is 35% further);
4. Walking time is 32 minutes vs 45 minutes (Adams takes 40% longer);
5. Biking time is 8 minutes vs 13 minutes (Adams takes 62% longer);

By all objective measures, Carrollwood K-8 is significantly closer to *Plaintiff*'s home than Adams Middle School.

The resulting increased segregation is also indisputable: *Defendant*'s only race report[11] states that Adams Middle School is 92.95% non-white and that Carrollwood is 58.22% non-white. The reason for this race disparity is because Carrollwood K-8 is beset on all sides by predominantly white neighborhoods, and Adams Middle is mostly surrounded by minority neighborhoods[12]. The disparity in educational opportunity between the schools is vast (Carrollwood K-8 is an A-rated school, where Adams is D-rated).

Both Carrollwood K-8 and Adams Middle school offer appropriate grade instruction for J.W. (sixth grade) for the 2023-2024 school year.

The reason for this is obvious: The Hillsborough County School Board manufactures A-rated schools by going out of their way to exclude under performing minorities from their best schools. They went so far to bus in distant white students to help the school grade, but then excluded near by minority students who resided in "undesirable" neighborhoods. The political influence is palpable, it is no coincidence that the border in question between Carrollwood and Lake Magdalene corresponds directly with the Original Carrollwood

---

[11] *see* Exhibit F
[12] *see* Exhibit Q

Home Owners Association boundary. Original Carrollwood was founded in the mid 1950's, likely for the same reason most HOA's were created around that time: to create race deed-restrictions to exclude Negros from their communities and unfavorable desegregation court decisions around that time. This boundary they used, does not correspond to any major roads. It is the result of a likely racist HOA applying political pressure to the school board to indirectly draw their boundary around. And decades later, they succeeded again in 2023 by convincing the school board to convert Carrollwood from a K-5 to a K-8 further isolating those Original Carrollwood residents from Negros.

### D.  REMEDY

"In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws ... a court ... shall consider and make specific findings on the efficacy in correcting such denial of the following remedies and shall require implementation of the first of the remedies". *see* 20 U.S. Code § 1713.

Here, the desired remedies sought in this injunction are the top two: (a) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account school capacities and natural physical barriers; and (b) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account only school capacities;

As previously outlined, Carrollwood K-8 has capacity to accept *Plaintiff*'s enrollment. The proposal that the school board voted on lists Carrollwood K-8's capacity at 886 with projected enrollment of only 651 (73% utilization) for

the 2025-2026 school year[13].

To whatever extent that Carrollwood K-8 does lack capacity (it does not), that is only because *Defendant* unlawfully assigned geographically distant white students to fill the capacity. *Defendant* cannot bus in distant white students then deny local/closer minority students by claiming overcapacity. Large swaths of the Carrollwood K-8 boundary reside further away from Carrollwood K-8 than *Plaintiff*'s home[14]. Put simply, if Carrollwood K-8's boundary were drawn in a manner compliant with the EEOA, available capacity would be high after you jettisoned all of the incorrectly assigned students. Removing area 1 alone would free up 40 student seats[15].

### 3. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

The last day of school in Hillsborough County Public Schools is May 26, 2023. *Plaintiff*'s are about to enter summer break without knowing which middle school J.W. will attend. He does not know which teachers he will have, what classroom supplies he will need, or where to tell his friends that he will be next year. His current Elementary School sent an email to parents today telling them to have their child wear their middle school's colors to school on May 22, 2023. We do not know what our middle school's colors are yet. Even if we get a ruling before the start of the 2023-2024 school year, this state of limbo would inflict psychological harm on any child that cannot be undone. But J.W.'s situation is worse, he has an I.E.P., and a last minute assignment would conflict with the implementation of that I.E.P. due to the unique abilities of this student. Not only does it violate provisions of the I.E.P, this is not a student that you can just assign/re-assign to

---

[13] *see* Exhibit E pp. 3
[14] *see* Exhibit N.
[15] "Area 1: Hill Middle to Carrollwood PK-8: 40 assigned students shifting". *see* Exhibit E.

9

difficult schools on a whim. Preparation is required to implement the I.E.P at whatever school J.W. attends. Any delay in this preparation would likely interrupt the provision of services. To be clear, this is not a cause of action related to the education of J.W., it is merely showing irreparable harm absent an injunction.

And all of that assumes we get a ruling before the start of the 2023-2024 school year. If the ruling is after the start of the 2023-2024 school year, the psychological harm to a child a child having to change schools is well known. *Plaintiff* would likely opt to keep J.W. at whatever school he starts 2023-2024 at to avoid this harm which would incur other harms such as increased transportation costs and the stress of a long commute to school multiple times every school day for three years.

J.W. is currently enrolled at for the sixth grade is Coleman Middle School, which is approximately 12 miles away. Absent an injunction, that is the school he will attend. The great distance results in a loss of community for *Plaintiffs*. The Father cannot attend all school events or be more involved with the school activities. And the relationships that J.W. fosters at that school cannot be maintained in his neighborhood. It would fragment his life and his home and school communities. The only current public middle school options for J.W. are Colemand Middle School and Adams Middle School. By the time *Defendant* actually passed boundary changes, school choice and magnet application windows had already closed.

## 4. THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS

*Defendant* will not be harmed if the injunction is granted, quite the opposite actually: they would benefit because the school J.W. is currently enrolled at for the sixth grade is Coleman Middle School which is one of the most over-crowded middle schools in Hillsborough County at 109% utilization. Transferring him from

Coleman to Carrollwood (which has capacity) would help ease school crowding issues, which *Defendant* has publicly stated many times is their primary reason for engaging in the re-boundary analysis in the first place. It is quite a curious thing that the *Defendant* would even resist a transfer from an over-utilized school to an under-utilized one. It smells of first amendment retaliation. *Defendant* receives the same amount of money in funding for J.W. regardless of whether he attends Coleman or Carrollwood.

## 5.  Injunctive Relief is in the Public Interest

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public." Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1293 (11th Cir. 2021). "Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." Id. (citing Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020)).

Moreover, the State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." Legend Night Club v. Miller, 637 F.3d 291, 302–03 (4th Cir. 2011). Conversely, for Plaintiffs, even minimal infringements upon First Amendment values constitute irreparable injury. Catholic Diocese, 141 S. Ct. at 67. As Dr. A recognized when it enjoined New York's similar scheme, "the public interest lies with enforcing the guarantees enshrined in the Constitution and federal anti-discrimination laws." Dr. A, 2021 WL 4734404, at *10. Indeed, "[p]roper application of the Constitution . . . serves the public interest [because] it is always in the public interest to prevent a violation of a party's constitutional rights." Dahl, 2021 WL 4618519, at *6.

## 6. BOND

Bond should not be required for the injunction because of the strength of the underlying merits and the strong public interest of both the state and the United States in rooting out racial educational discrimination. *see* BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 970–71 (11th Cir. 2005). Additionally, as outlined previously, *Defendant* would not be harmed, but rather benefit from the injunction.

5-16-2023

Date

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM